[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION NATURE OF PROCEEDINGS
Nineteen months after first being placed in foster care and fourteen months after being committed to the Department of Children and Youth Services (DCYS) as a neglected and uncared for child, Jamaul R., born April 14, 1987, became the subject CT Page 671 of this petition, filed January 29, 1991, by which DCYS seeks to terminate the parental rights of Gail W. and Marcellino R., Jr., his mother and putative father, pursuant to 17a-112 of the Conn. Gen. Statutes (Rev. 1991) applicable to children previously committed to the state. In the initial hearing on February 28, 1991, service by publication on the putative father was confirmed, his whereabouts having been unknown to all parties since Jamaul's initial placement in foster care in June of 1989. Personally served, Gail appeared with the same court-appointed counsel who had represented her in the earlier neglect proceeding, and contested the proposed termination of her parental rights.
She and the petitioner joined in a motion to secure a psychological evaluation to include mother, child, foster mother and the maternal grandmother who had recently been suggested by Gail as a possible permanent caretaker for Jamaul. A June 20, 1991 trial date was continued until August on motion of the petitioner. Both parties rested after the second day of trial, August 23, 1991, and the parties were given until September 20, 1991 for the submission of trial memoranda. The period of reserved decision thus commences on September 20, 1991.
Facts
Evidence offered at two days of trial, interpreted in the light of the prior record in this court concerning this mother and child, of which judicial notice is taken, supports the finding of the following facts:
Gail W. was 15 years old and living with her mother in the American Virgin Islands when she gave birth to Jamaul in St. Croix on April 14, 1987. In conflict with her mother, she left home soon after and moved to Connecticut where, 17 months later, she gave birth to a second out-of-wedlock son whose custody she has retained since his birth. The following April, shortly before his second birthday, Jamaul while in the mother's care suffered second and third degree burns which covered his entire back, right leg and arm and both feet. (State's Exhibit A., neglect trial, September 28, 1989 — Discharge Summary.)
A referral was made to DCYS for suspected child abuse but investigation was delayed due to his transfer from Hartford Hospital to Massachusetts General in Boston and thence to the Shriners Hospital in Boston for further burn treatment. Gail failed to visit during the early weeks of his Boston hospitalization despite being offered bus fare and tokens, but after spending one week-end at the Shriners Hospital learning CT Page 672 the required treatment, Jamaul was discharged to her care on May 22, 1989. Almost immediately, DCYS began to receive referrals from various health professionals concerned over Jamaul's failure to be brought to necessary medical appointments and his mother's lack of cooperation with supportive services (Visiting Nurse; physical therapist) which resulted in their termination. After five missed medical appointments deemed essential for his recovery from the burns. DCYS secured an order of temporary custody on July 6, 1989 in connection with a neglect petition filed pursuant to 46b-129. Gail appeared with counsel at the initial hearing on the temporary custody. She agreed to leave the child in temporary custody but contested the allegations of neglect. She thereafter failed to appear for a court-ordered psychological evaluation or for the adjudicatory hearing on September 28, 1989 when Jamaul was found to have been neglected by reason of inadequate parental supervision resulting in his burns, and also uncared-for in that Gail was unable to meet his specialized needs. The child would have been committed on that date but for the failure of DCYS to submit the mandated social study required by subsection(c) of 46b-129.
Since the matter had to be continued, a summons was ordered to secure Gail's appearance so that she could be advised of the necessary steps to take to secure her son's return.
At the dispositional hearing on November 9, 1989, Gail did appear and agreed that Jamaul should be committed to DCYS and with the expectations enumerated by the court to effect his return (States's Exhibit A.) These included the maintenance of regular contact with DCYS, visiting the child as often as DCYS permitted, participation in individual and parenting counselling, the securing of adequate housing in her own name — independent of the sister with whom she then lived — and participation in the child's medical treatment.
In the early months of his commitment, Jamaul's relationship with his mother was maintained by frequent visitation. With timely medical care and the assistance of the community support systems which were accepted by the foster mother, his burns continued to heal and his weight, initially seen as diminished by "inadequate nutritional support" (Shriners Hospital discharge summary, cited supra) improved, although he continued to display developmental problems requiring special services (State's Exhibit B., p. 2.) While Gail visited him several times a week for the first months of his commitment, she fulfilled none of the other expectations for the resumption of his care:
She failed to keep appointments with a Parent Aide so that CT Page 673 again this service was discontinued; she failed to keep intake appointments for individual counselling; she failed to secure her own housing. (See treatment plan, July 3, 1990, in court file.) Nonetheless, despite these failures and the fact that this now 39 month old child and had been in foster care for 15 months, the plan of DCYS continued to be reunification with his mother. A month after this treatment plan, however, Gail came to the DCYS office and told the social worker that she was willing to have Jamaul adopted. She gave the social worker an address, but when an appointment was sent there for her to come in and execute the consent, the address proved false and DCYS was again unable to ascertain her whereabouts (Testimony of Stacy Gerber, August 22, 1991.) She did not visit Jamaul after August of 1990, but three months later on November 8, 1990, she called DCYS and repeated her desire to give the child up for adoption. This time she refused to give an address, but agreed to keep an appointment made for her to come into the DCYS office on November 13, 1990 to execute the consent. She failed to keep that appointment or to communicate further with DCYS.
During the 21 months that Jamaul was in foster care prior to the filing of this petition, the DCYS social workers made many efforts to assist his mother with the requirements for reunification: Repeated referrals were made to the Parent Aide program, to coincide with her visits to Jamaul in the foster home, but she missed so many that she was terminated from the program. (Testimony of Kim Stewart, August 22, 1991.)
DCYS nonetheless agreed to look into this possible placement for the child. The grandmother, although encouraged to visit the child on her weekly visits to Hartford, did not do so prior to the psychological evaluation on March 27, 1991 when the child appeared frightened, clinging to the social worker and attempting to avoid contact with both his mother or grandmother. After a few more attempts to establish a relationship with Jamaul, the grandmother ceased all efforts of this kind after June of 1991.
In testifying on her own behalf, Gail stated that she had stopped her frequent visits with Jamaul because she did not like the way he was being treated by the other children in the foster home (testimony of respondent mother, August 23, 1991), but failed to communicate her concerns to the DCYS social worker. She admitted that she had never been told, either by the foster mother or DCYS, to decrease visitation, but claimed that she had done so when another foster child had told her to come only once a week. Again, she did not communicate or question this message, despite its unlikely source, to the social worker. She admitted failing to inform DCYS when or where she moved because, in her opinion "There was no reason. . . CT Page 674 I wanted no one to know", although she acknowledged that had Jamaul fallen ill, it would have been impossible for DCYS to have contacted her at once. She had been asked to move out of her sister's apartment when it became too crowded and had lived in a succession of single furnished rooms with her younger child, which she admitted were inadequate for Jamaul.
In her testimony in August of 1991, more than two years after Jamaul's placement in foster care, she testified that "I don't have any place for him right now" and disclosed that she was expecting a third child in October of 1991. Asked why her mother had stopped trying to visit Jamaul in June of 1991, Gail gave no reason, stating that was a matter between the grandmother and DCYS. In cross examination, she confirmed that she knew a termination petition would be filed if she failed to fulfill the court's expectations, but could give no reasons for her failure except for stating that she stopped keeping appointments with the Parent Aide because "Sometimes things got rough." She knew individual counselling had been expected, having signed the expectation list which included this, but did not go because "I'm not crazy." She had admitted telling DCYS in July of 1990, and again four months later, that she wanted to release Jamaul for adoption because doing what was expected for reunification was "too much" for her. She was unaware of Jamaul's developmental deficits or of the special care which these entailed. Asked again why she had stopped visiting Jamaul in August of 1990, she told the court "I just wanted to be around Aaron" (her younger child). Asked why she refused to let DCYS visit her at her current address, she testified that "I just didn't want anyone to visit".
In his clinical evaluation of Jamaul, his mother, grandmother and foster mother on March 27, 1991, the psychologist found him to be "a child with physical, development and psychological deficits." (Court's Exhibit 1, p. 6).
His mother was seen as "an intellectually limited woman" who denies past difficulties and takes no responsibility for the injuries." (Id.) He found no relationship existing between the child and his mother or grandmother, and concluded that the foster mother of nearly two years — half his life — was the child's psychological parent from whom separation, even for permanent adoptive placement with strangers, would present problems:
"He will require a well informed, patient, firm and affectionate parent in order to be able to survive childhood with some chance of normalcy in adulthood. This evaluation does not show that his mother or his grandmother possess an CT Page 675 understanding of his characteristics or that either of them has the interest to satisfactorily attend to his rearing." (Court's Exhibit 1, p. 8).
The biological father's whereabouts continue to be unknown and there was no evidence of any contact with the child or his caretakers since the first referral on this child was received by DCYS in April of 1989.
ADJUDICATION — ON FACTS AS OF JANUARY 29, 1991.
Absent any updating amendments to the pleadings, grounds to terminate parental rights must be determined by facts existing on the date this petition was filed, January 29, 1991.
Father — No evidence was offered that Marcellino R., Jr. had ever acknowledged paternity or been adjudicated the father of Jamaul. If he has any parental rights stemming from the fact that the child bears his surname, the record is both clear and convincing that he has abandoned this child, not only in the statutory sense but also in the more stringent common law sense of a total cessation of all contact, direct or indirect.
This fact alone supports two other grounds for terminating what parental rights the named father might have: As pleaded, no relationship exists between father and son at present, and given the history of total noninvolvement and unknown whereabouts, it is clear that to permit still further time to pass in the hope of establishing such a relationship with this man would be inconsistent with the best interests of this scarred, developmentally delayed, special needs child. While not pleaded, a third nonconsensual ground can be found from these facts: The putative father was no closer on January 29, 1991, to being ready, willing or able to care for this child than he was in November of 1989 when the child was committed to DCYS. This constitutes a failure to rehabilitate within the statutory definition of 17a-112 (b).
MOTHER — The same three nonconsensual grounds can be found by clear and convincing proof in this record for terminating the parental rights of Gail W.:
(1) While she visited frequently in the first year of Jamaul's foster placement, all contact ceased abruptly in August of 1990 with a variety of explanations offered, none of which are convincing: The other foster children mistreated him; a foster child told her to visit only once a week; she wanted to spend more time with her younger child; the foster mother told her not to visit (Court's Exhibit 1. p. 9: CT Page 676
"The mother's assertion that her declining visitation is a consequence of reduction imposed upon her by the foster mother does not appear credible.") While this abandonment was only of five months duration as of the adjudicatory date, given the time of and reasons asserted for the cessation, the child's special needs and the growing bond with his foster mother, the balance of the twelve months required by the statute may properly be waived based upon the totality of circumstances surrounding this particular child. 17a-112, subsection (c). See In Re: Migdalia M., 6 Conn. App. 194 at 210 (1986).
(2) Failure to rehabilitate — As of the adjudicatory date, Gail had fulfilled none of the expectations set 14 months earlier for resuming his care. While she had visited frequently at the outset of commitment, she stopped abruptly five months before this petition was filed, giving no valid reason. She refused to cooperate with any helping agencies, denied the need for counselling, never secured stable housing, and refused to inform DCYS of her changing whereabouts. A full year after commitment, in November of 1990, Gail acknowledged she still had no way to care for Jamaul and agreed that he should be freed for a permanent home through adoption. This is clear and convincing proof that she has failed to rehabilitate with regard to her present or reasonably foreseeable ability to meet the needs of this child, within the definition of this ground, particularly considering the special needs of this four-year old. In Re Rayna M. 13 Conn. App. 23 (1987).
(3) No ongoing parent child relationship: Evidence from two sources (Gerber's testimony; Court's Exhibit 1) compels the conclusion that no relationship presently exists between Jamaul and his mother. His last memory if it exists of living with her would be of the pain of being left in a scalding bath while in her care. Even if his most recent memories were positive, it is clear that the abrupt cessation of all contact in August 1990 resulted in a situation where he now reacts to his mother more negatively than to his current state social worker. In Re Juvenile Appeal (Anon) 181 Conn. 638, 645-646 (1980). It is just as clear and convincing from this record that to permit still more time than the 21 months that has already elapsed since Jamaul was last in his mother's care, given the diminution of both contact and evidenced concern for his welfare, would be inconsistent with his best interests.
In the seven months between the adjudicatory date and the last day of trial, Gail began to visit more frequently, but this fact alone, considering the anticipated birth of another child while continuing to live in single rooms inadequate for two children and to deny all responsibility for Jamaul's CT Page 677 condition, does not change the conclusion that any further delay of permanency in the hope of reestablishing a parent-child relationship would be an exercise in futility that would defeat this child's best interest.
DISPOSITION — FACTS AS OF AUGUST 23, 1991
Between the adjudicatory date and the final day of trial, little had changed with Gail W. She began to visit Jamaul more frequently than in the preceding months, but she still had no housing, was not engaged in any kind of counselling or parenting training, continued to deny responsibility for Jamaul's early trauma and had become pregnant for the third time. Her mother had expressed interest in making a plan for the child, but was a stranger to him and, after a few contacts, ceased her brief effort to establish a relationship with him.
Before the court may consider terminating parental rights, it must consider the six factors set forth in subsection of 17a-112 (d):
(1) DCYS repeatedly referred Gail to services (VNA, Parent Aide, counselling) that would help her become an adequate caretaker for a traumatized, developmentally delayed child. She failed to follow through with any of them and testified that she saw no value in them. Visitation was freely permitted at a location only a mile from where the mother was residing at the time of commitment. The decrease and, finally, cessation of visitation was not the result of any action taken by the petitioner. DCYS social workers repeatedly assisted Gail in her fruitless search for adequate housing. No further services could have been offered to this mother under these circumstances.
(2) While not orders, the court's expectations at the time Jamaul was committed, designed to facilitate reunification of mother and son, were wholly unfulfilled. Gail had begun the period of commitment with frequent visitation, but even this single positive move toward reunion with her child lapsed by the latter half of 1990 during which period she twice indicated her intention of voluntarily terminating her parental rights.
(3) The child's strong bond with his foster mother and lack of any evidenced relationship with either his mother or maternal grandmother were clearly observed by both the clinical evaluator and the social worker.
(4) As of the dispositional date, Jamaul had spent the last 28 CT Page 678 of his 52 months of life in the home of a foster mother with whom he has strongly bonded. He should not be required to wait longer than half a lifetime for the permanency which every child — and particularly one as fragile as Jamaul — must have in order to develop normally. In another year he will be leaving the security of his home for the wider world of public school. He should not have to continue his foster-child limbo status when he makes this move.
(5) Other than frequent visits in the first year of his commitment, Gail has done nothing to adjust her circumstances, conduct or conditions to make it in Jamaul's best interest to return to her care in the foreseeable future. She stopped visiting him a year before the dispositional date, and only began to visit more frequently during the pendency of this litigation. She has never maintained regular communication with DCYS and, indeed, flatly refused to reveal her whereabouts on more than one occasion, making it impossible for DCYS to contact her in an emergency or for any other reason.
(6) Nothing has prevented Gail from maintaining a meaningful relationship with Jamaul. She was never told by anyone at DCYS to decrease her visits with her son but did so for her own varying reasons, none of which appeared to be compelling. Economic circumstances were never given as a reason for her discontinuing contact with the child, or for failing to take advantage of the supportive services to which she was repeatedly referred.
None of the foregoing considerations is applicable to a punitive father who has been totally absent from the child's life since infancy. Marcellina R.'s whereabouts have been unknown to DCYS and his presence unseen by the child for at least the last two years. DCYS cannot offer services and the court cannot articulate expectations for such a parent.
Having considered the foregoing, it is found by clear and convincing proof to be in the best interests of Jamaul R. for his parents' rights to be terminated so that he may know, for the first time in over two years, the security of a permanent home — this time with adequate caretakers.
If the foster parents are able to adopt, this would be by far the most preferable course of action in the view of the clinical evaluator. If they cannot adopt, his transition into adoption by competent, nurturing adoptive parents can be expedited most effectively if unclouded by the legal possibility that the natural parent might decide to reenter the child's CT Page 679 life. Whether or not the foster parents can adopt, the time for closure of Jamaul's relationship with this biological family is long past due.
Therefore it is ORDERED that the parental rights of Gail W. and Marcellino R., Jr. in and to the child Jamaul R. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child in adoption as soon as consideration of his best interests permit, and that the said Commissioner shall file with this court a written report as to the progress toward such adoption no later than 90 days following the date of this judgment, and thereafter at such times and in such forms as this court may from time to time require. If the child has not been adopted by the end of April of 1993, the said Commissioner is further ORDERED to submit to this court by that time a Motion to Review Plan for Terminated Child to be in conformity with Federal law.
APPEAL
The parents have 20 days from the date of this judgment in which to take an appeal. If they request an appeal and their trial counsel is willing to represent them, this court will appoint that attorney to act as appellate counsel at public expense until all appellate process is completed. Practice Book #4017. If however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, he is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book #4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merits, the reason for this opinion shall be promptly submitted to the court in writing. The parties will then be informed by the court clerk that they have the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke,152 Conn. 501 (1965).
If such procedure satisfied the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interest in achieving permanent nurturing parents is entitled to at least as great a CT Page 680 degree of consideration as those of the parent whose right to raise the child is at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process, which could take years, is exhausted.
Entered at Hartford this 10th day of January , 1992.
FREDERICA S. BRENNEMAN, JUDGE